**Willa MAYES, Appellant-Defendant,**

v.

**STATE of Indiana, Appellee-Plaintiff.**

No. 2–1080A346.

Court of Appeals of Indiana,
Fourth District.

March 17, 1981.

Charles E. Johnson, Indianapolis, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Thomas D. Quigley, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

CHIPMAN, Judge.

A jury found defendant Willa Mayes guilty of three counts of Neglect of a Dependent,[1] two counts of Criminal Recklessness,[2] Involuntary Manslaughter,[3] and

---

1. Ind.Code 35–46–1–4.

2. Ind.Code 35–42–2–2(a).

3. Ind.Code 35–42–1–4.

Reckless Homicide.[4] This appeal presents only one issue for our review: whether the State proved the defendant's sanity beyond reasonable doubt. After careful review of the lay and expert testimony in this case, we conclude there is insufficient evidence to prove Willa Mayes was legally sane at the time of the commission of the crimes charged.

Reversed.

■ At the time defendant Mayes was tried the burden of proof on the issue of sanity rested with the State. The defendant was presumed to be sane. *Young v. State*, (1972) 258 Ind. 246, 280 N.E.2d 595; *Hollander v. State*, (1973) 156 Ind.App. 329, 296 N.E.2d 449. However, once she challenged that presumption by introducing evidence to show she suffered from a mental defect or disease which either prevented her from conforming her conduct to the requirements of the law or from appreciating the wrongfulness of her acts,[5] the burden rested upon the State to prove the accused was legally sane beyond a reasonable doubt. *Burr v. State*, (1977) Ind., 367 N.E.2d 1085; *Johnson v. State*, (1977) 265 Ind. 652, 358 N.E.2d 748.

The State's first witness was officer Joseph Lackey, a homicide detective with the Indianapolis Police Department. On November 25, 1977, Lackey was called to the defendant's residence at 4209 North LaSalle Street in Indianapolis. There he found six children; one child, six year old Daniel Bush, was pronounced dead at the scene. Defendant Mayes and the deceased child's mother, Trula Bush, were also in the home. Three of the children were the defendant's grandchildren. The other two minors, William and Cathy, were the children of Trula Bush. The children were found sleeping on the floor in the basement of the home, where officer Lackey also discovered what appeared to be an "altar" with pictures of Christ, many candles and a large Bible.

All the children were removed from the home. Defendant Mayes attempted to pre-vent medical personnel from removing the body of Daniel Bush claiming the child was not dead but merely in a "death trance." Defendant claimed she had also been in similar trances many times. Twice she struck the deceased child on the chest before being restrained. Defendant was carrying a Bible and "two small sticks" which she said she had whittled for the police officers who arrived at the scene. During direct examination officer Lackey was questioned about Mayes' state of mind:

"Q: Now, Officer Lackey, how did the defendant seem to you that night, how did she appear?

A: Well, . . .

Q: Did she act like she knew what she was doing?

A: I would—no, I don't think so. I would say no."

During cross-examination officer Lackey responded in similar fashion:

"Q Did Mrs. Mayes appear to be normal, or sound, at the time?

A: No, sir."

The State's next witness was Dr. Josephino C. Aguilar, a forensic pathologist who performed the autopsy on the body of Daniel Bush. Dr. Aguilar testified that the child had twice the normal levels of sodium and chloride in his body, and ten times the normal amount of potassium. It was the doctor's opinion that Daniel died of "malnutrition and dehydration, together with an overdose, if you will, of salt." The other Bush children, William and Cathy, also had dangerously high levels of sodium, chloride and potassium in their bodies; both children were mildly dehydrated and weak. The defendant's three grandchildren were found not to be suffering from excessive salt ingestion.

The horror story surrounding the death of Daniel began to unfold when the State called Trula Bush to the stand. Trula testified that she and defendant Mayes made all the children drink salt water to drive out "wickedness":

---

**4.** Ind.Code 35–42–1–5.

**5.** Ind.Code 35–41–3–6.

"She [defendant] said that we had to drink the salt water to get the filth out of us and it would take the wickedness and evilness away from us."

Trula also explained why her children were given more salt than was given to defendant Mayes' grandchildren:

"[M]y children were so filthy because of the fact that they were mine and I had been messed up in witchcraft, so, therefore, they had the same amount of filth that I had. Salt water was to clean them so that we could be saved and go to the altar."

Trula referred to defendant Mayes as "Jesus." She testified that when her son Daniel began to vomit blood, Mayes offered the following explanation:

"She [defendant] said that Daniel was through, that he had given up the ghost. When I asked her what was that, she said he had given up the old man and taken on the new man. And that was Christ. But the rest of us was still holding on. And when I asked her how come I couldn't get rid of mine, she said it was because I wasn't trying hard enough."

The jury heard the testimony of four psychiatrists. Dr. Louis W. Nie was appointed by the court to evaluate defendant Mayes in December 1977. During his examination Dr. Nie found Mayes to be "loquacious, over-active and demonstrative in her manner . . . speech and motor behavior." While Mayes was oriented to time, place and person and had normal memory functions, Dr. Nie found she experienced delusions and hallucinations and had practically no insight into her situation "since her fanaticism with regard to her religious beliefs tends to deny the realities around her." During the examination Mayes demonstrated how "Jesus gets into me," how she believed herself possessed and her thoughts and behavior controlled by Jesus. Dr. Nie concluded Mayes was psychotic and probably had been so for many years. It was his opinion that defendant Mayes' perceptions of reality were so distorted that it was impossible for her to control her actions in accordance with customs and roles. In short, she was incapable of managing her behavior.

Dr. Dewitt Brown, a licensed psychiatrist since 1947 and Associate Professor of Clinical Psychiatry at the Indiana University School of Medicine, was also appointed by the court to evaluate defendant Mayes in December 1977. Dr. Brown's observations were similar to those of Dr. Nie. He found Mayes to be suffering from visual and auditory hallucinations and delusions, noting her belief that Christ had returned to earth and was "in her." It was Dr. Brown's opinion that defendant Mayes was "psychotic or grossly mentally ill" at the time of the alleged offenses, and that Mayes had probably been psychotic for a number of years. On cross-examination Dr. Brown was asked whether an individual who faces punishment for violating the law might tend to exaggerate symptoms of insanity or abnormality during the psychiatric evaluation. Dr. Brown replied:

"Yes, that sometimes happens. I do not believe that this lady is capable of putting on that type of an act."

Dr. John E. Kooiker, a licensed psychiatrist since 1953 and professor of psychiatry at the Indiana University Medical Center, examined defendant on three different occasions in February and March of 1978. Dr. Kooiker consulted defendant Mayes' family physician who noted a 1974 diagnosis of "simple schizophrenia." Dr. Kooiker also found Mayes to be suffering from visual hallucinations. He diagnosed her illness as either a "hysterical psychosis" or a "paranoid schizophrenic psychosis" which prevented her from appreciating the wrongfulness of her acts and from conforming her conduct to the requirements of the law.

Perhaps the most thorough testing was conducted by Dr. Ronald Hull, a psychiatrist engaged in private practice since 1953. Dr. Hull's direct examination of defendant Mayes was supplemented by psychological testing completed by a clinical psychologist. Dr. Hull's conclusions were consistent with those of Dr. Nie, Dr. Brown, and Dr. Kooiker. Dr. Hull found Mayes suffered from a "paranoid or hysterical psychosis" with var-

ious manifestations, including delusions, symptoms of acceleration of her mental processes, disorganization of thought patterns and inappropriateness of emotions. It was Dr. Hull's opinion that defendant Mayes' psychosis prevented her from appreciating the wrongfulness of her acts and from conforming her conduct to the requirements of the law. Dr. Hull stated that at the time of the alleged offenses Mayes could not have appreciated the fact that consumption of quantities of salt could be harmful because "she probably had a belief that it had some magical powers."

Defendant Mayes took the stand to testify on her own behalf. The record demonstrates her testimony was often disjointed, and sometimes quite bizarre. When asked the simple question, "do you know Trula Bush?", Mrs. Mayes responded:

"A No, I did not know Trula Bush. And I declare it in the name of the Father and Son and the Holy Spirit to Heaven and hope Heaven will take the breath out of my body. I met Trula Bush down to James's cousin house. Her name was Mary Polar. My hand's still holding to Heaven, do you understand me? I want you all to understand me clear, I do not lie. I has no reason to lie to you peoples here. When I saw that woman I was through praying for Mary Polar. She walked up the step, her and another woman. I didn't know her name at that time and I didn't know her name when I come here, not even to jail. All I knowed was Sissie. All right, . . .

MS. DeLANEY [Prosecutor]: Your Honor, I object to the narrative . . .

A . . . when they got through, when I got through . . .

MS. DeLANEY: . . . form of this testimony.

A . . . looking at her I went . . .

THE COURT: All right, . . .

A . . . out in a trance. I stayed out two hours and forty-five (45) minutes. I didn't know Trula Bush. I met her in 1960—1976, . . .

MS. DeLANEY: Your Honor, I still object to the narrative . . .

A . . . the thirtieth . . .

MS. DeLANEY: . . . form of this testimony.

THE COURT: All right, . . .

A The thirtieth (30th) of . . .

THE COURT: Wait a minute. Wait a . . .

A The thirtieth (30th) of June.

THE COURT: . . . minute. Objection will be sustained to the narrative form . . ."

At one point during her testimony Mrs. Mayes was asked to face the jury while she spoke; she explained that whether she faced the jury was not her decision:

"THE COURT: All right, I think if you'll face the jury they'll have a better time to hear you.

MR. MANN: The jury's over here.

THE COURT: It's kind of difficult for them to hear you. You talk . . .

A Well, see, I don't—I don't move myself, you see, whichever way—whichever way the power move me, you know, I ain't got nothing to do with that. So all I'm here to do is tell the truth and nothing but the truth.

MS. DeLANEY: Why don't you face the jury when you talk? How's that?

A So, like I said, I don't move mys . . .

Q She wants you to look at those ladies and gentlemen there.

A But I can't. I don't know which a'way he going to move me. Do you understand?

Q Which way what's going to move you?

A I don't know which a'way God going to lead me with his power. I don't know which way he going to sit me. Do you understand? I do nothing on my own, I say nothing on my own, I speak nothing on my own.

Q Now, . . .

THE COURT: Next question, Mr. Mann."

Defendant Mayes repeatedly denied having given any salt to any of the children in her home. She testified that the only thing she knew about salt was what the Bible had taught her:

"A  I don't know anything about no salt. All I know about salt is what the Bible speaks of salt.

Q  What does the Bible say about salt?

A  In the eighth (8th) Chapter of St. Mark the Bible says . . .

MS. DeLANEY: Your Honor, I object to this . . .

A  . . . if you use salt . . .

MS. DeLANEY: . . . as being completely irrelevant.

A  . . . an it lose it flavor . . .

THE COURT: Overruled.

A  . . . or the perfection, it is good for nothing, but to take and put it on a man feet for him to trallow on it. If it lose its flavor or the perfection is it good for nothing. It ain't even fitting to season the food if you lose the flavor out of it. And the next one, in the Chapter of James, in the third (3rd) Chapter, in the twelfth (12th) verse, says to take the salt if it cannot bring the oil from the fig tree and put it into water and salt in the water and clean your wall and your 'frigerator for a refreshment . . .

MS. DeLANEY: Your Honor, I renew the objection . . .

A  . . . This is the things I know about salt.

MS. DeLANEY: . . . to the relevancy of this.

A  I know only the Bible and . . .

THE COURT: Objection will be overruled.

A  . . . nothing but what the Bible speaks of. I know nothing else about no salt. I haven't given no one no salt and I declare it in the name of the Father and the Son and the Holy Spirit and the whole Heaven and to take my breath from me. I don't know nothing about the salt.

I didn't see her give her children no salt. I didn't see her give anyone no salt. Like I said, on that Thursday I was cleaning my house. I liken one (1) bed in the back bedroom where her kids slept. I liken dusted up my living quarter down in the basement. And I declare it in the name of the Father and the Son and the Holy Spirit. I'm here to tell the truth, you hear, for you blind people eyes to be opened up to the truth and for you blind people eyes to be really seeing the truth and . . .

MS. DeLANEY: Your Honor, I object to . . .

(At this point the Court began to rap his gavel.)

A  . . . to have the understanding or knowledge . . .

MS. DeLANEY: . . . this display of . . .

A  . . . and of (unintelligible) and that's what it's here for.

THE COURT: All right, answer the questions.

A  So this is what it for.

THE COURT: Just answer the questions of your lawyer, Mr. Mann.

A  Listen to me. Mrs. Mayes, can you listen to me? I'm . . .

A  Yeah, I'm listening. I mean, I like I say, whichever way the power take me, I has . . .

MS. DeLANEY: Your Honor, . . .

A  . . . nothing to do with it.

MS. DeLANEY: . . . I still object to this self-serving . . .

A  You can't reject the . . .

MS. DeLANEY: . . . statement, not in response . . .

A  . . . power of God. You can only reject the power of man.

MS. DeLANEY: . . . to questions.

Q  Let me ask you this, . . .

MS. DeLANEY: Your Honor, could we have a short recess?

Q  . . . did you go downstairs and find that little boy asleep or dead or . . .

A On that Thursday night, as I said,—let me—if you all let me tell something I can get it out, but, see, I do nothing on my own, I say nothing on my own, I speak nothing on my own. Look at my hand, look at my arms, look at me. That's all I ask you to do ....

*MS. DeLANEY*: Your Honor, ...

*THE COURT*: Let's take a short recess here at ...

A So, what I'm trying to do ...

*THE COURT*: ... this time and, Mr. Bailiff, ...

*MS. DeLANEY*: Thank you, Your Honor.

A ... is tell the truth and that's all I'm going to do, is tell the truth.

*THE COURT*: ... do you want to take the jury out?

Q Do you want a little drink of water?

*THE COURT*: We'll take a short recess here.

Q Do you want a little water?

A No, I don't want no water. I just want ...

*THE COURT*: Do you want to take the jury out? We'll take a recess.

A ... to tell the truth."

When questioned about Trula Bush's involvement with witchcraft, defendant Mayes hinted at her belief in the magical cleansing power of salt:

"Q: Well, was she [Trula Bush] involved in witchcraft or voodoo or anything?

A: She told me her mother witchcraft her when she was a baby and never washed her off with no salt until she was two (2) years old. Now, that's when I report the salt to her, what God had said about salt. That's when I grabbed my Bible and showed her what Jesus said about salt. Because I know nothing about witchcraft, demons, or nothing else. I don't even talk of it. I don't even believe in it. That's a ill-minded person ...."

On cross-examination defendant stated, "eat too much salt ... it give you drops. I know you could have too much salt in your blood and it would dry your blood up."

Defendant Mayes also described her own magical powers for the jury:

"A See, I reads people, you know, and then I go and touch 'em, you know. I do have the power in my hand that God give me to heal people. I don't heal 'em, but, see, the power of God heals 'em, you understand? I don't do nothing.

Q You mentioned one time, you told me that Jesus lives with you or?

A Christ lives in my womb and I declare it in the name of the Father and the Son and the Holy Spirit. This is what's wrong with me, now. All you got to do is look at my hand, look at my arm, look at my face, ...

Q What is it about your hands and arms, what about your hands and arms, what about them, explain what's ...

A What, I'm talking about, I'm crucified in the flesh, as you see. My feet's the same way and my hand's made that way. My hand don't go straight out. My hand's not made like yours. Where yours goes straight out mine would not go straight out. I can open 'em up no farther than that and they goes that way, see, where yourn sticks straight up, mine don't do that. So I'm moved by the Holy Ghost in His—in—in the—in the—in God's power."

Whether Willa Mayes was legally sane when she administered salt to the children in her home was a question of fact for the jury. *Murphy v. State*, (1976) 265 Ind. 116, 352 N.E.2d 479. Our Supreme Court has held a jury may discount or reject expert psychiatric testimony when it finds lay testimony more persuasive. *Lonson v. State*, (1980) Ind., 406 N.E.2d 256; *Lynn v. State*, (1979) Ind., 392 N.E.2d 449. *See also Atkinson v. State*, (1979) Ind.App., 391 N.E.2d 1170. The jury may hear lay opin-

ion as to the sanity of the defendant. *Williams v. State*, (1976) 265 Ind. 190, 352 N.E.2d 733. The jury may also consider the acts of the defendant before and after the commission of the crime. *Lonson v. State*; *Lynn v. State*. However, the burden ultimately rests with the State to prove the defendant sane at the time of the alleged offense to the exclusion of every reasonable doubt. The jury's verdict must be based upon the evidence at trial and cannot be the product of conjecture, suspicion or guess. *Ruetz v. State*, (1978) 268 Ind. 42, 373 N.E.2d 152.

We find in the present case the State failed to produce substantial evidence of probative value from which a reasonable trier of fact could infer sanity beyond a reasonable doubt. Four doctors testified defendant Mayes suffered from a psychosis which prevented her from managing her reckless behavior. Two doctors testified that Mrs. Mayes' mental illness prevented her from appreciating the wrongfulness of her acts. Of course, the jury was entitled to reject this expert medical evidence in the face of more persuasive lay testimony, but what lay testimony? Officer Lackey testified defendant Mayes *did not* appear normal or sound when he spoke with her at her home. The only other police officer to testify, Charles Farrell, told the jury defendant Mayes "made some strange words to me which I had no knowledge of what they meant." *No* witnesses stated the defendant exhibited a normal appearance or demeanor at or near the time of the crime. The evidence was, in fact, to the contrary. Certainly, in this case no reasonable inference of sanity could be drawn from proof of the commission of the crime alone. While our insight is limited to the record on appeal, there is every indication that Willa Mayes' demeanor in the courtroom was as bizarre as the substance of her testimony on the witness stand. During the cross-examination of Dr. Nie the record shows defendant Mayes "raised her hands above her head and began gasping and rolling her eyes." A recess followed. On the morning of the second day of trial Mrs. Mayes entered the courtroom singing, "I thank you, Jesus, thank you, Jesus, thank you for what you did to me. You been so good to me. I thank you, thank you, Jesus. Thank you for what you did to me."

We are drawn to the conclusion that the State failed to prove defendant Mayes was legally sane at the time she committed the crimes charged. To hold otherwise would be the equivalent of placing the burden on the defendant to prove her sanity, which was not the law in Indiana when this case was tried.

We therefore reverse the judgment of the trial court and remand this case with an order to vacate the defendant's convictions, to enter verdicts of "not guilty by reason of insanity" as to all charges, and to proceed in accordance with the evaluation and commitment procedures of Ind.Code 35–5–2–5.

YOUNG, P. J., and MILLER, J., concur.