Willa MAYES, Appellant,

v.

STATE of Indiana, Appellee.

No. 1082S398.

Supreme Court of Indiana.

Oct. 20, 1982.

Charles E. Johnson, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Thomas D. Quigley, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

This cause comes to us on a petition to transfer from the Court of Appeals, Fourth District. Following a jury trial in the Marion Superior Court on April 13, 1978, appellant Mayes was convicted of three counts of Neglect of a Dependent, Ind.Code § 35–46–1–4 (Burns Repl. 1979), two counts of Criminal Recklessness, Ind.Code § 35–42–2–2(a) (Burns Repl. 1979), Involuntary Manslaughter, Ind.Code § 35–42–1–4 (Burns Repl. 1979), and Reckless Homicide, Ind.Code § 35–42–1–5 (Burns Repl. 1979). Appellant Mayes was sentenced to terms of imprisonment of two years each on the three counts of Neglect and the two counts of Criminal Recklessness, those sentences to be served concurrently, and eight years for Reckless Homicide, that sentence to be served consecutively to the other sentences. Sentencing on the remaining count was withheld. On appeal, the judgment of the trial court was reversed. *Mayes v. State,* (1981) Ind. App., 417 N.E.2d 1147. The Court of Appeals held that there was insufficient evidence to prove appellant Mayes was legally sane when the crimes were committed. The State of Indiana petitions this court to transfer this case and to set aside the judgment of the Court of Appeals. We agree with the State and hereby grant transfer and vacate the opinion of the Court of Appeals.

The only question presented for review is whether or not there was sufficient evidence presented to allow the jury to find appellant Mayes legally responsible for her acts.

The evidence showed that on November 25, 1977, appellant Willa Mayes lived with her grandchildren, William Williams and Michael and Sabrina Collier, in Indianapolis. At the same time, Trula Bush and her children, Daniel (the decedent), William, and Kathy, also lived in Mayes' house. It appeared that two men also lived there from time to time. When police officers arrived at the home in the early morning hours of November 25, they found Daniel Bush dead and Kathy and William Bush "in bad

shape." The Bush children, along with Appellant's grandchildren, were taken to Wishard Hospital. The autopsy revealed that Daniel Bush had died of malnutrition and dehydration, together with an overdose of salt. His body contained higher than normal amounts of sodium, chloride, and potassium, and the other two Bush children also had very high concentrations of the same elements while Appellant's grandchildren did not have high levels of those elements in their bodies.

The police officers who investigated found in the basement of the residence what appeared to be some sort of religious altar. Police officers said when Mayes talked to them she did not appear normal and they did not know what she was talking about. Evidence from Trula Bush revealed that Willa Mayes claimed to have Jesus in her body and said that she was Jesus, and Mrs. Bush believed that Appellant really was Jesus. Trula Bush said that her mother had "witchcrafted" her and Appellant told Bush that therefore Bush and her children needed salt to cleanse their bodies. Appellant also told Bush that Bush and her children needed more salt than the others because they were filthier in body and spirit. Bush said that when her son Daniel was vomiting blood Appellant told her that "Daniel was through, that he had given up the ghost" and "had given up the old man and taken on the new man and that was Christ." Later, when Daniel appeared to be dead, Appellant told Bush that he was not dead but was in a trance. Four expert psychiatric witnesses, two of them called by the State, testified that in their opinion Willa Mayes was psychotic and mentally ill. It was the opinion of all four doctors that Appellant could not detect right from wrong and did not have the ability to conform her conduct to the requirements of the law.

■ When appellant Mayes was tried, the burden of proof on the issue of sanity rested with the State, and the law stated that the defendant in a criminal prosecution was presumed to be sane. *Young v. State*, (1972) 258 Ind. 246, 248, 280 N.E.2d 595, 597.

Once Mayes challenged that presumption by introducing evidence to show that she was not accountable for her acts at the time the crimes charged were committed, the burden of proving sanity beyond a reasonable doubt was upon the State. *Sypniewski v. State*, (1977) 267 Ind. 224, 231, 368 N.E.2d 1359, 1363; *Montague v. State*, (1977) 266 Ind. 51, 59, 360 N.E.2d 181, 187.

■ The Court of Appeals reached the conclusion that the State had failed to prove appellant Mayes was legally sane beyond a reasonable doubt. In reaching this conclusion the Court of Appeals failed to recognize the proper standard of review regarding sufficiency questions where insanity is involved. It is well settled law in Indiana that a claim of sufficiency of the evidence on the question of sanity is treated on appeal as any other insufficiency claim. The standard of review regarding sufficiency questions is the same in all cases. We will not reweigh the evidence, judge the credibility of witnesses or resolve conflicts in the evidence. To do so would usurp the function of the jury. *Lonson v. State*, (1980) Ind., 406 N.E.2d 256, 259; *Hauger v. State*, (1980) Ind., 405 N.E.2d 526, 528. On the subject of who should determine whether a defendant is or is not legally sane, this Court quoted *United States v. Freeman*, (2d Cir. 1966) 357 F.2d 606, in *Hill v. State*, (1969) 252 Ind. 601, 617, 251 N.E.2d 429, 438:

". . . At bottom, the determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. Ideally, psychiatrists—much like experts in other fields—should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused-his characteristics, his potentialities, his capabilities. But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts. In so deciding, it cannot be

presumed that juries will check their common sense at the courtroom door."

It has been uniformly held that the trier of fact is given wide latitude to believe or disbelieve what and whom it chooses in deciding whether to hold a defendant legally responsible for his or her acts. We provided that the jury may accept or reject any statement of the witnesses, including expert witnesses, and may rely on lay testimony and other evidence in the case to determine sanity. *Jelks v. State,* (1978) 269 Ind. 86, 88, 378 N.E.2d 848, 849. "All the facts and circumstances surrounding the events, as well as lay testimony regarding appellant's appearance and conduct, may be considered, and the jury may accept or reject the statements of any or all witnesses including psychiatrists." *Morris v. State,* (1979) Ind., 384 N.E.2d 1022, 1024. "The function of the expert witness is advisory in nature. He does not state facts, but rather renders an opinion to aid the trier of fact, with whom the ultimate decision must rest." *McCoy v. State,* (1979) Ind., 393 N.E.2d 160, 163.

In *Lynn v. State,* (1979) Ind., 392 N.E.2d 449, all expert witnesses testified, as in the case before us, that defendant Roger Lynn was unable to appreciate the wrongfulness of his actions and lacked substantial capacity to conform his behavior to the law. Lynn had a history of cruelty to people and small animals and also had periods of depression and boredom. Yet we found in *Lynn* that considering all the evidence before the jury, which included the methodical planning of the murder, the jury was warranted in concluding beyond a reasonable doubt that either the mental deficiencies testified to in regard to Lynn were not manifest to him to such a degree as to constitute a mental disease or defect or that he had substantial capacity to appreciate the wrongfulness of his conduct and was capable of conforming his conduct to the requirements of the law. *Id.,* 392 N.E.2d at 453. Even the dissent in *Lynn* noted that "[i]n considering the issue of sanity the jury is not confined to the opinions of the witnesses, expert or lay. They may rely upon their own judgment based upon the facts in evidence." *Id.,* 392 N.E.2d at 454.

Again, in *Lonson, supra,* the facts demonstrated the bizarre activities and attitudes of defendant Lonson in his perpetration of the murder of his parents, and all expert psychiatric witnesses were of the opinion that he was insane. It was determined in that case, as in *Lynn, supra,* that the question of sanity is a question of fact which is to be determined by the jury. There the facts presented to the jury showed that Lonson went to a sporting goods shop and bought a revolver. He was required to fill out federal and state forms, including a certification that he had never been committed to a mental institution. A seven-day waiting period was required before he could take possession of the gun. He falsified the fact of a prior commitment, made a down payment of twenty dollars, and later returned to the store and took possession of the revolver. The owner of the shop testified that Lonson acted normally, his speech was understandable and coherent and he gave responsive answers to questions regarding personal information needed to fill in the forms. The evidence also showed that Lonson stated that he first considered killing his parents years before but then he had "no job and no money." After reviewing the evidence, we held that "[t]here was sufficient evidence from which the jury could find that, if the defendant was suffering from a mental disease or defect at the time of the incident, he retained a substantial capacity during the criminal acts to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law." (citations omitted) 406 N.E.2d 256, 260.

■ The jury was free in the case before us to believe whomever it chose. During the trial, Mrs. Mayes was present herself before the jury and testified in her own behalf. Several of the expert witnesses testified that their opinions were based on their appraisal from the examination of Mayes and based on the facts given to them by Mayes. They testified that had it appeared that the facts were otherwise, their

opinion also could have changed. As the State points out in its petition to transfer, the jury could have determined from all of the facts presented to it that Willa Mayes was able to control her actions and conform them to the requirements of the law but was also able to make it appear that she could not do so.

The evidence showed that Mrs. Mayes' daughters trusted her with their children and left them in her care. One of the grandchildren, Billy Williams, testified that his grandmother treated the children well except for occasional punishments and Mayes stated that at times when the daughters would take the children home, the children would call and ask Willa Mayes to come and get them again. Apart from her anxiety toward religion, Mayes led a fairly normal life, kept her home clean, was able to take care of herself, did her own banking and cooking, and held a job as a cook. She had a good memory and was of normal intelligence. She stated on the witness stand that she knew salt was harmful to the body and that it would "dry your blood up" and denied that she had given salt to anyone. As stated above, it was apparent that she gave salt water to Trula Bush's children but gave a very small amount to her own grandchildren. There was some evidence of a conflict between Mayes and Bush and as the State points out, some inference that Mayes may have wanted Trula Bush and her children out of the house. Mayes testified that she had to pay all of the bills and Trula Bush would not even get up to feed her children and more or less "thought I was a maid I guess so I wasn't no maid." Mayes also told Trula Bush that she should not testify about the salt. The jury could have found that Appellant's demonstrations before them, in which she sang songs thanking Jesus for all He had done for her, were not consistent with statements she made indicating that she knew it was dangerous to take too much salt and denying that she had given too much salt to any of the children. Officer Lackey testified that when he tried to determine what had happened, Mayes would not answer his questions squarely and would not speak coher-

ently. But when Officer Charles discovered that one of the Bush children was too weak to walk, Mayes hurried to her grandchildren and said, "See my children, they're just fine, there's nothing wrong with them." The jury could also have reasonably inferred that Appellant's claim that her actions were controlled by Jesus or the power of the Holy Ghost was an attempt by her to escape responsibility for her acts. Since the jury observed all the witnesses, including appellant Mayes, and heard all the evidence in the case, we cannot say when applying the proper standards of review that there was insufficient evidence before the jury to find the appellant guilty of the charges and reject the plea of insanity.

Transfer is granted and the opinion of the Court of Appeals is vacated; the judgment of the trial court is in all things affirmed.

GIVAN, C. J., and DeBRULER and HUNTER, JJ., concur.

PRENTICE, J., dissents without opinion.